Totten, J.,
delivered the opinion of the court.
This is a bill to establish a resulting trust in favor of complainant. It appears that previous to the date hereinafter *458 stated, John A. Johnson and Moses Buchanan, now deceased, were the joint equal owners of certain slaves, namely, Nelly, Tilda, Sam, Viney, Margaret and Henry. On the 12th of January, 1841, Johnson made a power of attorney, authorising Buchanan to sell, mortgage, or otherwise dispose of his, Johnson’s, interest in said slaves. Buchanan took said slaves off, and on the 8th of February, 1841, made an absolute sale of them to James H. Buchanan, for the sum of $2,275. After the return of Buchanan, and about the month of May or June, 1841, said Moses Buchanan placed the sum of $1,100, in the hands of his father, Robert Buchanan. The latter, with $1,000 of said sum of money so placed in his hands, purchased the slave Cassey and her children, in the pleadings mentioned. The bill charges, that said sum of $1,100, was part of the proceeds of the sale of the slaves Nelly, Tilda, and others, jointly owned by Johnson and Moses Buchanan, and sold by the latter as before stated. It further alleges, that on the 3d day of October, 1843, said Johnson “ conveyed all of his interest in said fund arising from the sale of said slaves,” Nelly and others, to the complainant. It also alleges, that Moses Buchanan placed said sum of $1,100 in the hands of his father, “ to buy a family of slaves for complainant.” Upon this view of the case, the complainant insists that a trust was created in his favor; that he is the equitable owner of the slaves Cassey and her children; and asks that it be decreed accordingly.
The case made out by the proof, is, that Cassey and her children were purchased for Moses Buchanan; that he received them into his possession in June, 1841, immediately after the purchase; and that he retained them in possession, claiming them for himself up to the time of his death, which happened on the 8th of October, 1843.
It further appears, that in the life-time of Moses Buchanan, said Robert Buchanan fraudulently caused an execution to issue upon- a decree to which said Moses was a party; which *459 decree had been previously satisfied ; -and upon said execution said slaves, Cassey and her children, were seized and illegally sold on the 27th of May, 1843, and said Robert Buchanan pretended to purchase the same at the nominal price of $500. Said slaves, however, remained in the possession of Moses Buchanan until his death; and although they were afterwards in the possession of Robert Buchanan for a time, it seems he did not pretend to claim them as his own. Robert Buchanan died in July, 1844. On the 28th of November, 1846, the present defendant, McDonald, as administrator of Moses Buchanan, filed a bill against the personal representative of Robert Buchanan, to have the pretended sale of Cassey and her children set aside, and said slaves delivered to him; and at the March term of the chancery court, 1848, a decree to this effect was accordingly made; and on 28th of June, 1848, the present bill was brought against the administrator of Moses Buchanan, to have said slaves, Cassey and her children, delivered up to the complainant.
The proof is by no means satisfactory. From all the circumstances, however, there is reason to believe that the money with which Cassey and her children were purchased, was part of the proceeds of the slaves, Nelly, Tilda, and others. But there is no evidence to sustain the allegation of the bill, that the money was deposited by Moses Buchanan in the hands of Robert Buchanan, to purchase a family of slaves for the complainant. The proof does not show what disposition was made of the balance of the fund arising from the sale of Nelly, Tilda, and others. It does not distinctly appear that Johnson’s half of said fund was paid over, or accounted for to him by Moses Buchanan ; but, yet, there are circumstances in the case rather tending to leave the impression that, possibly, Johnson’s portion of the money may have been applied in discharge of certain liabilities of his, or in some other way. No cause is shown for the omission of Johnson to assert any such *460 claim during the life of Moses Buchanan, although he held and claimed Gassey and children for the period of about two years and a half before his death; nor is the delay of the complainant to assert such claim against his personal representative sufficiently accounted for. But, in our view of the case, it is not necessary that we should analyze the proof, or state the facts more particularly.
In the argument here, the complainant’s right to a decree for the slaves, Cassey and her children, is placed upon the ground that the money with which they were purchased, was the money of Johnson. The principle within which it has been attempted to bring this case, admits of no question. It is well settled, that if an agent or trustee convert a trust fund in his hands into another species of property, and its identity can be traced, it will be held, in its new form, liable to the rights of the cestui que trust. A. court of equity in such case, holds the cestui que trust to be the equitable owner of the property, and will decree it to him accordingly; not upon any notion of his having ratified the act, but upon the mere ground of a wrongful conversion, creating, in foro conscenta, a trust in his favor. 2 Story’s Eq., sec. 1258, 1260. It must, however, be clearly established, that the property upon which the trust is sought to be fastened, has been paid for out of the specific trust fund. It is not sufficient to prove that the purchaser of the property had a fund belonging to another in his hands, unless the employment of that particular fund in the purchase be also proved. And the trust must arise out of the relations between the parties and state of facts existing at the time of the purchase ; it cannot be raised by matters occurring subsequent to the purchase, and not in the contemplation of the parties at the time thereof.
Upon this point, if it were conceded that one joint owner of personal property, having a fund in his hand arising from an authorised sale, by him, of the joint property, with the assent of *461 the other joint owner, was a trustee or agent in the sense of the rule above referred to, we should not feel warranted to decree for the complainant, because the proof does not sufficiently establish that the money with which Cassey and children were purchased, was the specific money derived from the sale of Nelly and others; or, that it was certainly the money of Johnson.
2. But, if the trust were clearly established, we are of opinion that it could not now be enforced, upon the ground that the statute of limitations interposes an insuperable bar. The trust in the present case, if any were raised, is admitted to have been merely a constructive trust, and within the operation of the statute. But it is argued, upon the supposed authority of Norment vs. Smith, (1 Hum. 46,) that as the slaves, Cassey and children, did not come to the possession of the defendant, as administrator of Moses Buchanan, until within a few months of the filing of this bill; and inasmuch as the defendant cannot unite his own possession of the slaves with that of his intestate, so as to make out the length of possession required to form a bar, that the statute of limitations has no application to the case. The case of Norment vs. Smith, is wholly unlike the present case. The principle laid down in that case is entirely correct, in reference to the state of facts presented in the record, but it is altogether inapplicable to the facts of the present case. The report of that case is not accompanied by a statement of the facts; but by reference to the record, it appears that in the month of January, 1827, Norment placed the slave, Robin, in the possession of his son-in-law, Elgin, merely as a loan. On the 8th December, 1827, said slave, Robin, was levied upon as the property of Elgin, at the instance of his judgment creditors ; and on the 25th of January, 1828, was sold at execution sale and purchased by William Allen, at $215. On the 7th of June, 1828, Allen sold said slave to Samuel G. Smith. On the 27th oí February, 1829, Norment sued Smith in an action of detinue, to recover *462 said slave. This suit remained undisposed of at the death of Smith, which occurred 1st September, 1835. Thomas Smith qualified as executor of Samuel G. Smith 21st January, 1836, and on the 4th of February, 1837, Norment brought his bill in the chancery court at Franklin, against said executor, to recover said slave; the action at law having abated by the death of the testator.
The foregoing are the facts upon which the decision (1 Hum. 46,) was made. From this statement, it is apparent that, in seizing and selling the slave as the property of Elgin, the sheriff was a trespasser; the sale, as also the purchase by Allen, was a conversion of the slave ; and Samuel G. Smith, who came into possession of said slave, under Allen, was chargable in law with such conversion. Smith, therefore, stood in the attitude of mere wrong-doer, having no color of title to the slave by his pretended purchase; and having had less than three years possession, acquired none by the statute of limitations. The possession of the testator was as a trespasser, a wrong-doer, as against the rightful owner, and the possession of the executor was no less so. The testator having no title or right of possession to the slave, there was nothing to be transmitted to the executor. The slave was not, and could not be, assets in the hands of the executor. And in taking possession of the slave, the executor placed himself upon the footing of a naked wrong-doer, and became chargable with the original conversion.
The decision, in this view, was therefore unquestionably correct. It is a well settled principle, alike applicable to real and personal property, that between successive wrong-doers, having no title, there can be no privity, and therefore their possessions cannot be united, so as to make out the time required to form the bar of the statute of limitations. The case, which seems to be sometimes misunderstood, was intended to lay down no broader or more general principle, than *463 its particular facts called for ; nor is it to be otherwise regarded.
But very different is the case now before us. Admitting, for the sake of argument, that the slaves in controversy were purchased with the money of Johnson ; still, they were taken and held in possession adversely to Johnson, the complainant, and all others, for a period of about seven years before the filing of the present bill. And they were so held under a title which could not be impeached in a court of law'. True, upon the assumption of the bill, a trust might have been fastened upon the slaves, in favor of Johnson, of .his assignee. But this could only have been done in a court of equity. Johnson, or his assignee, had an election to demand the money, or to follow the slaves into which it had been converted. If he elected to take the money, then the title of Buchanan was absolute both at law and in equity. Before such election, the title of Buchanan was,' at most, only defeasible in equity ; and a sale to an innocent purchaser would have defeated such election, and vested the latter with an unimpeachable title. This was such a title, too, as the law would transmit to the personal representative of Buchanan, and the slaves, in his hands, would be assets, before an election by Johnson to claim them; and a lawful sale of them, by the personal representative, before such election, to an innocent purchaser, would defeat such election. In this case, therefore, a legal title having passed to, and vested in the executor, he can unite his possession with the possession of his intestate, so as to create the bar of the statute of limitations. There being a legal title, the administrator stood in privity with his intestate ; and the possession of the former was a continuation of the possession of the latter.
3d. The allegation of the bill, that Johnson assigned his interest in the fund, arising from the sale of Nelly and others, to the complainant, is not, we think, sustained. The instru *464 ment under which he claims, as assignee of the fund, purports to be a conveyance, or bill of sale, whereby Johnson conveys to the complainant “all the claim, interest and demand” that he, Johnson, has “in and to” the specific slaves Nelly, Tilda, Sam, Viney, Margaret and Henry, by name and description. But the conveyance in express terms provides, that he is, “in no event, to be liable, or in any way held responsible, or accountable, for the title to said slaves ; as it is the understanding of the parties that I do hereby convey and vest in said Moffit whatever title, interest, or claim I have in and to said slaves.”
Now, it is obvious, that as Johnson had been divested of all interest in, and title to said slaves, both at law and in equity, by the sale to James H. Buchanan more than two years preceding this conveyance to complainant, there remained in him no interest to convey. The conveyance is certainly in-> operative for the purpose expressed upon its face, and cannot' take effect according to the letter; nor do we perceive how, upon the most liberal principles of construction applicable to deeds, effect can be given to it, so as to pass the fund in question. It is not necessary, however, to discuss this point as the decision is placed upon a different ground.
The decree of the chancellor will be affirmed.